KAREN P. HEWITT
United States Attorney
W. MARK CONOVER
Assistant U.S. Attorney
California State Bar No. 236090
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-5200/(619) 235-2757 (Fax)
Email: mark.conover@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Case No. 08CR1969-JM |
| Plaintiff, | DATE:       July 25, 2008 |
| | TIME:        11:00 a.m. |
| v. | Before Honorable Jeffery T. Miller |
| CHRISTOPHER SAINT LUCERO, | UNITED STATES' RESPONSE TO |
| | DEFENDANT'S MOTIONS TO: |
| Defendant(s). | |
| | (1)    COMPEL DISCOVERY ; |
| | (2)    GRANT  LEAVE  TO  FILE |
| | FURTHER MOTIONS |
| | |
| | TOGETHER WITH STATEMENT OF |
| | FACTS AND MEMORANDUM |
| | OF POINTS AND AUTHORITIES |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Karen P. Hewitt, United States Attorney, and W. Mark Conover, Assistant U.S. Attorney, and hereby files its Response to Defendant's Motions in the above-referenced case. Said Response is based upon the files and records of this case together with the attached statement of facts and memorandum of points and authorities.

///

///

1    DATED: July 24, 2008.

2                                          Respectfully submitted,

3                                          KAREN P. HEWITT
                                           United States Attorney
4

5                                          s/ W. Mark Conover
                                           W. MARK CONOVER
6                                          Assistant United States Attorney

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                         2

1    KAREN P. HEWITT
     United States Attorney
2    W. MARK CONOVER
     Assistant U.S. Attorney
3    California State Bar No. 236090
     United States Attorney's Office
4    880 Front Street, Room 6293
     San Diego, California 92101-8893
5    Telephone: (619) 557-5200/(619) 235-2757 (Fax)
     Email: mark.conover@usdoj.gov
6

7    Attorneys for Plaintiff
     United States of America
8
                    UNITED STATES DISTRICT COURT
9
                   SOUTHERN DISTRICT OF CALIFORNIA
10
                                    )   Criminal Case No. 08CR1969-JM
11   UNITED STATES OF AMERICA,       )
                                     )   DATE:        July 25, 2008
12                       Plaintiff,  )   TIME:        11:00 a.m.
                                     )   Before Honorable Jeffery T. Miller
13              v.                   )
                                     )
14   CHRISTOPHER SAINT LUCERO,       )   UNITED   STATES'   STATEMENT   OF
                                     )   FACTS   AND   MEMORANDUM   OF
15                    Defendant(s).  )   POINTS AND AUTHORITIES
                                     )
16   ─────────────────────────────

17                                   **I**

                          **STATEMENT OF THE CASE**
18

19          On June 13, 2008, Christopher Saint Lucero (hereinafter "Defendant"), was indicted by a

20   grand jury with violating 8 U.S.C. §§ 1324 (a)(1)(A)(ii), (a)(1)(B)(I), and (v)(II), Transportation

21   of Illegal Aliens for Financial Gain and Aiding and Abetting.  Defendant was arraigned on the

22   Indictment on June 17, 2008, and entered a plea of not guilty.

23                                   **II**

                          **STATEMENT OF FACTS**
24

25   **A.    DEFENDANT'S APPREHENSION**

26          On the evening of May 30, 2008, Border Patrol Agents met with three Wackenhut

27   Corporation employees, including Transportation Officer ("T.O.") Vincent Reyes.  T.O. Reyes

28                                    3

provided a four-page, typed and signed document outlining his observations of the actions of Wackenhut Sergeant Christopher SAINT-Lucero ("SAINT") that day. This document identified what T.O. Reyes believed was an alien smuggling event. In brief, the document and subsequent verbal account of T.O. Reyes stated the following:

T.O. Reyes reported that he and Sgt. SAINT were scheduled to work together. During the course of this shift they responded to several Border Patrol Stations and picked up aliens processed for voluntary returns to Mexico. They were operating their assigned marked Wackenhut MCI bus. T.O. Reyes was driving. T.O. Reyes and Sgt. SAINT transported the aliens to the San Ysidro Port of Entry and presented them to the Mexican immigration officers. One of the aliens, identified as Vidal Orellana-Cabrera ("Orellana"), (DOB 01/01/1964, FINS# 1075340875), was not allowed into Mexico because the Mexican immigration officers identified him as possibly being a Guatemalan citizen.

The Mexican immigration officer wrote "Guatem" alongside the alien's name on the I-216 form (The I-216 Record of Departure form is used to document the departure of Mexican nationals to Mexico. The departure is physically verified by Mexican immigration officials at the Ports of Departure and the forms are stamped by the Mexican officials and are to be returned to the Border Patrol Station from which the Mexican nationals were apprehended.), sheet number 9265568. T.O. Reyes wrote "kick back" on the form alongside the alien's name. Sgt. SAINT directed T.O. Reyes to cross out "Guatem" and "kick back" from the I-216. T.O. Reyes then heard Sgt. SAINT say the following to Orellana; "How much money do you have?" "Do you have money or can you get money?" "Is it Los Angeles that you're going?" "Can you get money them (sic)?" "This will cost you about $2,000.00 dollars." Orellana responded to Sgt. SAINT that he could get the money from Los Angeles.

T.O. Reyes then observed Sgt. SAINT place a call on his Nextel and heard him say, "It's what we talked about, and I have one. He can get the money in Los Angeles." T.O. Reyes said that upon receiving a "kick-back" from the San Ysidro Port of Departure their normal route of

1    travel would be to go to the Chula Vista Station via Beyer Boulevard whereupon the returned alien

2    is taken back to the Chula Vista processing center and turned back over to the Border Patrol.

3         After this exchange, Sgt. SAINT instructed T.O. Reyes to drive to the east side of the San

4    Ysidro Port of Entry and stop behind a section of buildings which was out of view of the port.

5    This required that T.O Reyes turn south onto East San Ysidro Boulevard from Camino De La Plaza

6    where it turns north onto East Beyer Boulevard.  Sgt. SAINT told T.O. Reyes to stop, whereupon

7    Sgt. SAINT escorted Orellana off the bus telling him to proceed to the corner and wait.  Sgt.

8    SAINT directed T.O. Reyes to proceed around the block, circling the Grey Hound complex and

9    upon nearing the corner where Orellana was standing, Sgt. SAINT told him to stop again.  Sgt.

10   SAINT got off the bus and approached Orellana.  After a few minutes Sgt. SAINT returned to the

11   bus, but upon seeing Orellana still standing at the corner, Sgt. SAINT said, "I told him to go to the

12   flag poles".   T.O. Reyes and Sgt. SAINT departed in the bus and as they passed the

13   Jack-in-the-Box Restaurant, located at 721 East San Ysidro Boulevard, he observed Orellana

14   walking towards the flag poles at the southwest corner of the restaurant.  Sgt. SAINT then made

15   contact with an unidentified subject via Nextel and informed him as to the location of Orellana.

16   As T.O. Reyes drove the bus, Sgt. SAINT explained that he had this all worked out and would

17   explain it to him.  Sgt. SAINT suggested that T.O. Reyes obtain a Nextel radio.  Sgt. SAINT

18   explained that when T.O. Reyes got "kick-backs" from the port to call him and he could transport

19   them in the (Wackenhut) Jeep and it would not be questioned.  Sgt. SAINT went on to tell T.O.

20   Reyes that he had done this about ten times already.

21        Agents assigned to the San Diego Sector Smuggling Interdiction Group (SIG) responded

22   to this report by preparing to observe the alleged smuggling activity.  On Sunday June 1, 2008, SIG

23   Agent Ortiz was placed undercover in a holding cell at the Chula Vista  Border Patrol Station in

24   Chula Vista, California along with William Romero-Estrada, an undocumented alien from El

25   Salvador. Agent Ortiz was in plain clothes and assumed the name Alberto Rodroguez-Osegueda

26   and the date of birth 09/28/1973.  He was listed as a citizen of Mexico and was presented as

27

28                                          5

1  processed for voluntary return to Mexico. Agent Ortiz and Romero were entered onto Bureau form

2  I-216 Record of Departure along with five other Mexican nationals processed for voluntary returns

3  under event number CHU0806000009.

4      At about 11:00 a.m., Wackenhut Sgt. SAINT arrived  to transport Mexican nationals

5  housed at the Chula Vista Border Patrol Station who were processed as voluntary returns to

6  Mexico. Agent Ortiz and ROMERO were loaded into the bus and transported to the San Ysidro

7  Port for Departure to Mexico. SIG Agents, all in plainclothes and operating unmarked DHS

8  vehicles, conducted surveillance of the Wackenhut bus. The driver of the marked Wackenhut MCI

9  bus, numbered 2049, was identified as to Otha Hayes. Sgt. SAINT was his assigned partner for

10  this shift.

11      At the  San Ysidro Port of Departure, all passengers were off-loaded and presented to the

12  Mexican immigration officers for interview before being allowed to proceed into Mexico. Agent

13  Ortiz was interviewed in turn by Mexican Immigration Officers. Agent Ortiz was questioned as

14  to his citizenship. Agent Ortiz said he was from the State of Chiapas. When questioned as to

15  where in Chiapas, Agent Ortiz said Santa Ana. The officer asked again where, to which Agent

16  Ortiz again replied Santa Ana. The officer asked Agent Ortiz how old he was, Agent Ortiz said

17  thirty-three years old. The officer asked Agent Ortiz what year he was born to which he replied

18  1970, in conflict to the information printed on the presented Form I-216. This alerted the officer

19  as it was not consistent with the information on the Form I-216, and Agent Ortiz was referred to

20  another Mexican immigration officer for further questioning. When asked where he was from,

21  Agent Ortiz said he was from El Salvador.

22      The Mexican immigration officer informed T.O. Hayes that Agent Ortiz was from El

23  Salvador. T.O. Hayes yelled to Sgt. SAINT, who was several feet away, "This guy is an OTM."

24  ("OTM" means "Other than Mexican"). Agent Ortiz was placed aside until the rest of the Mexican

25  nationals could be interviewed. Romero approached the Mexican immigration officer at the

26  voluntary return gate and was asked where he was from. Romero said he was from Chiapas as

27

28                                6

well. The officer asked where in Chiapas to which Romero replied Santa Ana. The officer immediately referred Romero to the assisting immigration officer for further questioning. Romero admitted to the officer that he was also from El Salvador. Romero was placed alongside Agent Ortiz until such time that the rest of the individuals could be interviewed. The remaining occupants on the bus were accepted as voluntary returns and allowed to proceed into Mexico.

With a set of handcuffs in his hand, Sgt. SAINT approached Agent Ortiz and Romero. Agent Ortiz asked Sgt. SAINT in the Spanish language to give them a break to which he replied in the Spanish language, "Give you a break?" "Do you have any money?" Sgt. SAINT then placed handcuffs on Agent Ortiz and Romero and escorted them into the bus. T.O. Hayes remained with the rest of the group being voluntarily returned to Mexico. Once back on the bus, Sgt. SAINT asked Agent Ortiz and Romero where they were going to. Agent Ortiz and Romero said they were going to Los Angeles. Sgt. SAINT asked if they had money. Agent Ortiz said he didn't have any on him. Romero said he was going to originally pay $3,000.00 dollars to be smuggled. Agent Ortiz then said he could pay $1,000.00 dollars. Sgt. SAINT said O.K., let me make a call. Sgt. SAINT then instructed Agent Ortiz and Romero not to say anything else until later. Agent Ortiz observed Sgt. SAINT use his telephone to alert someone with what Agent Ortiz believed to be a Nextel phone.

As T.O. Hayes entered the bus to depart the area, Sgt. SAINT told him that he would take care of them (the kick-backs). While en route to the Chula Vista Station Sgt. SAINT told T.O. Hayes that he would take Agent Ortiz and Romero to the (Chula Vista) station in the Jeep. T.O. Hayes asked Sgt. SAINT why, since they were already going to the Chula Vista Station in the bus. Sgt. SAINT replied: "Just do, don't ask!" They proceeded to the Chula Vista Border Patrol compound but did not return to the processing building, rather stopping at the gasoline pumps on the far southern side of the compound.

As the Wackenhut bus was entering the Chula Vista Station compound via the Beyer Boulevard gate a marked Wackenhut Jeep Liberty, bearing California license plate 5WRM280,

7

1    was departing the compound. Sgt. SAINT jumped out of his seat abruptly and told T.O. Hayes to

2    stop the bus. Sgt. SAINT got out, went to the driver of the Jeep, spoke to him briefly and walked

3    back to the bus. The driver of the Jeep, identified as T.O. Manley Lamont SMITH drove the Jeep

4    alongside the rear of the Wackenhut bus.

5         Sgt. SAINT then instructed T.O. Hayes to take a lunch break. Once T.O. Hayes departed,

6    Sgt. SAINT directed Agent Ortiz and Romero to get off of the bus. Once out of the bus, Sgt.

7    SAINT told Agent Ortiz and Romero to get in the Wackenhut Jeep. Agent Ortiz heard Sgt. SAINT

8    say to T.O. SMITH in the English language, "$5,000.00 bucks!" T.O. SMITH then said in the

9    English language to Sgt. SAINT, "$5,000.00!" in an excited tone of voice. T.O. SMITH told Sgt.

10    SAINT, "I have my car here, I can take them or I can stash them until later." Sgt. SAINT told T.O.

11    SMITH, "Let's see, let's go to your car." Sgt. SAINT then told T.O. SMITH, "I'll drop them off,

12    call me later." T.O. SMITH drove the Wackenhut Jeep to his car, a black Jaguar bearing California

13    license plate 5ZDJ068, and exited the Jeep. Sgt. SAINT got in the driver's seat of the Wackenhut

14    Jeep and drove off, departing the Chula Vista compound with Agent Ortiz and Romero handcuffed

15    in the back seat.

16         Once in the Jeep, in the Spanish language Sgt. SAINT informed Agent Ortiz and Romero

17    that he would take them to a park near the Border Patrol Station and make arrangements to pick

18    them up. Sgt. SAINT said he was the law, the authority and to do as he says. Sgt. SAINT said not

19    to worry because he was the law. Sgt. SAINT said to Agent Ortiz and Romero they would not get

20    caught and they would make it to Los Angles, he would see to it. Sgt. SAINT said once in Los

21    Angeles they would call their families to make the payment arrangements. Sgt. SAINT said to wait

22    at the park and not to leave or speak to anyone. Sgt. SAINT said to Agent Ortiz and Romero not

23    to walk around because there were a lot of Border Patrol Agents around. Sgt. SAINT said if they

24    left the park, he would find them and they would pay for it.

25         Sgt. SAINT proceeded to transport Agent Ortiz and Romero to the Howard Lane

26    Neighborhood Park located on the northwest corner of the intersection of Dairy Mart Road and

27

28                        8

1    Beyer Boulevard.  Agent Ortiz observed Sgt. SAINT drive around the block.  After doing so, Sgt.

2    SAINT again instructed Agent Ortiz and Romero to remain at the park or they would pay for it.

3    Sgt. SAINT handed Romero a handcuff key and told them to take the cuffs off.  At approximately

4    12:00 noon, Sgt. SAINT pulled up along the curbside on Dairy Mart Road and instructed Agent

5    Ortiz and Romero to get out and walk to the area where they were to wait.

6        Approximately an hour later, at about 1:20 p.m., Border Patrol Agents conducting

7    surveillance observed a black Toyota Tundra pickup bearing California license plate 8J45800, with

8    Sgt. SAINT behind the wheel.  Sgt. SAINT parked at the southwest corner of the park, lowered

9    his passenger side rear window and motioned with his hand to Agent Ortiz and Romero to come

10    to the truck.  Agent Ortiz and Romero slowly approached the vehicle afoot.  Agent Hansen advised

11    all units in the area to slowly approach the Toyota.  Agent Ortiz opened the rear door of the truck

12    and Romero entered the Toyota sitting in the rear seat.  Agent Ortiz opened the passenger's side

13    front door.  Agent Ortiz observed that Sgt. SAINT was still in full duty uniform with badge and

14    duty holster including his service issued firearm.  Agent Ortiz identified himself as a federal agent

15    and ordered Sgt. SAINT to raise his hands and not to move.  Sgt. SAINT complied.  Numerous

16    Border Patrol Agents then converged on the Toyota.  Agent Ortiz placed Sgt. SAINT under arrest

17    for suspicion of alien smuggling.  Sgt. SAINT, the black Toyota Tundra and Romero were taken

18    to the Chula Vista Border Patrol Station for processing.  Sgt. SAINT was in possession of three

19    cellular telephones, all of which were seized as evidence.  SAINT's duty belt and weapon were

20    seized.  His weapon was a .40 caliber Smith and Wesson semi-automatic, fully loaded with a

21    10-round magazine and one round in the chamber.  SAINT's duty belt contained two additional

22    fully loaded 10-round magazines.  The ammunition was S&W .40 caliber hollow point.

23        At about 1:45 p.m., Agents Ortiz, Rodriguez, Hansen and Harkenrider walked into to the

24    Wackenhut office, on the Chula Vista Border Patrol compound.  Agents observed T.O. SMITH

25    sitting at a desk near the doorway.  T.O. SMITH was in full duty uniform with his service issued

26    firearm on his person.  Agents placed T.O. SMITH under arrest for suspicion of alien smuggling.

27

28                                    9

1   Agents walked T.O. SMITH to the Chula Vista Border Patrol Station for processing.    While

2   walking, without having been asked any questions, T.O. SMITH stated, "Oh, I know what this is

3   about, I know now."  SMITH was in possession of five cellular telephones, all of which were

4   seized as evidence.  SMITH's duty belt and weapon were seized.  His weapon was a .40 caliber

5   Smith and Wesson semi-automatic, fully loaded with a 10-round magazine and one round in the

6   chamber.

7       Agent Hansen met with Wackenhut Lt. Cabusora in the late afternoon of June 1, 2008, and

8   seized the I-216 from today's event as well as the I-216 from Friday's event (5/30/08).  The I-216

9   regarding today's event indicated that both Agent Ortiz and Romero had been voluntarily returned

10  to Mexico.  There was no indication that they had been denied entry into Mexico.

11  **B.**    **POST-MIRANDA STATEMENT OF CRISTOPHER SAINT-LUCERO**

12      At 7:24 p.m. on June 1, 2008, SAINT provided SIG Agent Andrew Kahl with a videotaped

13  post-Miranda statement in the English language, which is summarized as follows:

14      SPA Kahl read SAINT his Miranda rights in the English language and asked if he had

15  understood those rights.  SAINT said that he understood his rights, and that he was willing to

16  answer questions without the presence of an attorney.  When asked about his employment, SAINT

17  stated that he is employed as the swing shift supervisor and Sergeant of Transportation Officers

18  for Wackenhut, and in which capacity he serves as a contract Transportation Officer (T.O.) for the

19  Border Patrol. When asked to explain how he had become involved in the smuggling of

20  undocumented aliens, SAINT stated that he and a Wackenhut co-worker of his, whom he identified

21  as Manley SMITH, had lived in Tijuana together as roommates and had rented a large house in

22  Calle Cucapah, from a subject known as "Ernesto" and his wife, whose name he believed was

23  Claudia MEDINA.

24      SAINT stated that he had explained to "Ernesto" that he worked as a T.O. for Wackenhut

25  and that he moved detainees for the Border Patrol.  "Ernesto" told him that smuggled aliens were

26  worth a lot of money.  He told SAINT that if he ever had any undocumented aliens available, that

27

28                                      10

he could take them off his hands and that there was good money in it. "Ernesto" stated that he had somebody who would take and smuggle the undocumented aliens. "Ernesto" told SAINT that he would give him half of whatever he earned per alien. SAINT stated that he interpreted this to mean that he personally would get about $1,000.00 (USD), but said that the exact amount was never specified. "Ernesto" told SAINT to call him if he ever has an alien to hand over and that he could come and pick the subject up.

SAINT stated that the first time that he decided to pursue "Ernesto's" offer was last Saturday, May 30, 2008, when SAINT was working together with another T.O. named REYES. SAINT stated that the only other time that he had ever attempted to smuggle any detainees was today, June 1, 2008.

SAINT stated that T.O. Hayes told him that two of the detainees had turned out to be OTMs from Guatemala. He said that the two aliens were separated and that they handcuffed them and placed them back on the bus. SAINT asked them where they were going to be smuggled to, and the two of them said that they were being smuggled to Los Angeles. He asked if they had someone waiting for them, and they stated that they did. He asked them how much they were to have paid, and one of the aliens stated that he had been tricked by a smuggler who had taken his money. The other alien stated that he had access to $1,500.00 (USD). SAINT told them that he knew a guy who could take them north and that it was a sure thing and that the guy was honest and wouldn't trick them. He asked if they wanted him to contact this guy and they told him, "Yes."

SAINT stated that he told T.O. Hayes that they were going back to Chula Vista Station. He stated that it was his intention to hand these two aliens over to "Ernesto" in exchange for half of whatever the smuggling fee would have been. Upon arriving at Chula Vista Station, SAINT stated that he told T.O. Hayes that he could go ahead and break for lunch, and that he would take care of dropping off the aliens at Chula Vista. He stated that T.O. Hayes then got in his personal vehicle and drove away.

1      SAINT said that as this was happening he saw T.O. SMITH arriving in the van, parking

2   it and getting the marked Wackenhut Jeep.  He stated that he flagged T.O. SMITH down and said

3   that he had two OTMs.  He stated that he had previously mentioned to T.O. SMITH that "Ernesto"

4   their prior landlord, had offered to take aliens off his hands for a percentage of the smuggling fee.

5   SAINT stated that T.O. SMITH appeared to already realize that he didn't really plan on bringing

6   the aliens back to Chula Vista Station.  He then stated to T.O. SMITH that he had made a deal with

7   the aliens and that he was trying to hand them over to "Ernesto" but that "Ernesto" wasn't

8   answering his phone.  He then stated to T.O. SMITH that OTMs were worth a lot of money, about

9   $2,500.00 (USD) each, which would total $5,000.00, implying that the two of them could share

10   whatever the profit was.  SAINT stated that T.O. SMITH was obviously interested and stated "OK"

11   and offered to use his personal car, a black Jaguar S-Type.  When SAINT told him that he was

12   going to use the Jeep, T.O. SMITH asked him if he wanted him to follow in his Jaguar.  He told

13   T.O. SMITH that he didn't think that it would be necessary, but that he would call him if he needed

14   anything like that.  SAINT stated that he hadn't even been able to reach "Ernesto" and that there

15   wasn't much point in him driving the aliens around if he couldn't get in touch with him.  He then

16   told T.O. SMITH that he was going to do a few laps around the block in the Jeep and see if he

17   could get in touch with "Ernesto" and that if that failed, he would just return the aliens to Chula

18   Vista Station.  T.O. SMITH stated to him "OK" and told SAINT to give him a call if he needed

19   him to come in his car.

20      SAINT stated that he pulled out of Chula Vista Station after driving a short distance he had

21   still not heard from "Ernesto" and so he explained to the two aliens that he couldn't reach his guy,

22   and then proposed that he drop them off at the park, telling them to stay in that exact spot, so that

23   the guy could find them, pick them up and take them north.  He told them not to walk around or

24   go anywhere, since it was close to the Border Patrol Station and it was likely that they would be

25   arrested.  SAINT returned to pick up the aliens and pulled up to the park in his Tundra and

26

27

28                                          12

1    motioned for the two Aliens to get in his truck.  As they loaded into the vehicle a bunch of agents

2    came up and arrested him.

3        SAINT was asked by Agent Kahl for permission to access and search the memory of his

4    Motorola i880 Boost phone, and he granted SPA Kahl consent to search the memory of his phone.

5    **C.    POST-MIRANDA STATEMENT OF MANLEY LAMONT SMITH**

6        At 5:47 p.m. on June 1, 2008, SMITH provided SIG Agent Andrew Kahl with a videotaped

7    post-Miranda statement in the English language, which is summarized as follows:

8        SPA Kahl read SMITH his Miranda rights in the English language and asked if he had

9    understood those rights.  SMITH said that he understood his rights, and that he was willing to

10   answer questions without the presence of an attorney.  SMITH stated that he understood why he

11   had been placed under arrest.

12       SMITH stated that he is a United States citizen and that he was born in York, Pennsylvania

13   on 08/23/69.  He currently lives in National City, California.  He said he used to live with SAINT,

14   but SAINT had cheated him out of some money.  When asked where they had rented, SMITH

15   started to respond, stammered and indicated that he wanted to leave it at that and not go awry.

16   When asked about his employment, SMITH stated that he is employed as a day shift supervisor

17   for Wackenhut, and in which capacity he serves as a contract Transportation Officer (T.O.) for the

18   Border Patrol.  He used to be a private security officer.  SMITH stated that he has worked for

19   Wackenhut since the contract began in December of 2006.  SMITH said he has a current "guard

20   card" and firearms permit.  SMITH said he worked graveyard shift, and now days.  SMITH said

21   he and SAINT have been employed together at Wackenhut since the contract began.  SMITH

22   stated that he has an application in as a police officer for Los Angeles International Airport

23   (L.A.X.) Police Department and that he had just been accepted.

24       On today's date, SMITH said he did a juvenile run, where he transports juvenile aliens from

25   the San Ysidro Port Enforcement Team to the VR gate, accompanied by a Mexican Consular

26   Official.  At about 11:00 a.m. he had just dropped off the consular officer and was returning his

27

28                                        13

assigned Wackenhut van when Sgt. SAINT called him stating he needed the van to transport aliens from Chula Vista. He was told there were ten more people than would fit in the bus. SMITH said he suggested that they have the next shift do it, but SAINT said they should do it all now. SMITH said he was in a Jeep at the time, having dropped the van off at the compound, so he returned and got back into the van. After loading the ten people into the van, he followed the bus to the POE and unloaded his people with those from the bus.

SMITH then went to get his I-216 for the juvenile run, which the Mexican consulate had kept. SAINT asked SMITH what else he needed to do today and SAINT told him to do his trip logs and go home. SMITH said his shift didn't end until 2:00 p.m., SMITH said he said thanks, but then remembered about the Lieutenant and realized he could not go home, because he calls them constantly and checks up on them. SMITH went to the pumps (Chula Vista Station compound) and dropped off the van and was getting into the Jeep when he saw SAINT and Hayes had arrived in the bus.

SAINT waved him down and said that he had two prisoners. SMITH asked him if they were OTMs. SAINT said that they were, and then took two people off the bus in handcuffs and put them in the Jeep. SMITH said he asked SAINT if he was taking them down to Chula Vista Station, and SAINT said "No, they offered me $5,000.00 apiece" SMITH said he replied, "Oh really, yeah right," because SAINT is always joking like that. SAINT again said that they offered $5,000.00 apiece, and SMITH said he replied, "Oh, OK, I got my car here," jokingly. SAINT then asked SMITH if he remembered Claudia and her husband, he responded that he did. When asked about his interpretation of SAINT's statement that the aliens had offered him $5000.00, he stated that the only thing which occurred to him was that the aliens had offered SAINT $5000.00 to let them go, but that he didn't take it seriously.

SMITH said he thought that Hayes was still on the bus. While driving to the barracks SMITH said that SAINT said something which he did not hear. SAINT asked him which car he had, to which SMITH said, "My Jaguar". SMITH explained that he owns a black 2003 Jaguar

14

S-type. SMITH stated that he could not remember what SAINT's response had been to his statement that he had his Jaguar. At the barracks SMITH then got out of the Jeep and SAINT drove off around the corner. SMITH stated that at no time did he believe that SAINT was really going to let the aliens go and that he had not taken him seriously. He stated that at no time did he actually offer to go get the Jaguar nor did he offer SAINT the use of his Jaguar. He said that SAINT did not ask to be allowed to use it either. He stated that he did not offer to help SAINT or agree to participate in setting the aliens free or smuggling them. SMITH stated that he fully believed that SAINT was going to drive around the corner and drop off the aliens at the Chula Vista processing center. He characterized his exchange with SAINT as him making a flippant remark to SAINT in a joking fashion, and nothing more.

When asked whether it was common practice to transport detainees around in the uncaged Wackenhut Jeep, SMITH stated that this was commonly done. When asked if it was normal to change the "kicked-back" detainees from one vehicle to another, instead of driving them straight back to the Chula Vista processing center, SAINT stated that this was also commonly done. SMITH said that, upon entering the office, he then called a female friend, whom he identified as Andrea Martinez, and told her what his Sergeant had said to him. SMITH said that the Sergeant had told him these guys had offered him $5,000.00. He told her that SAINT is always joking but that he seemed to have a serious tone in his voice this time. She told him that it wasn't worth anybody's job. He said "Yeah, but $5,000.00, that's just hilarious." She said she hoped he wasn't thinking about doing it. He said he was not, "but $5,000.00 will get you, we're always talking about, a motorcycle. I'm just selling my car for $3,000.00 and they offer $5,000.00 to do that", but he agreed that he wouldn't do it. She said that she didn't want to hear about it and asked him why he was telling her about this. SMITH said he answered that she was always saying that they never communicated, and that was why he was telling her.

SMITH said that SAINT returned and stated that he had not answered his phone. SMITH said he left his phone on the desk, and that it was on vibrate. SMITH asked whether SAINT had

15

1    dropped the aliens off at Chula Vista Station, to which SAINT said that he had.  SMITH said he

2    understood how someone observing his actions and his conversation with SAINT could conclude

3    that he was a willing participant in the smuggling event and that he was "in on it."  When asked

4    if he believed that SAINT had committed a crime by suborning him and offering him money to

5    help let the aliens go, SMITH stated that he didn't think so, and that he had simply thought that it

6    was a joke and hadn't taken it seriously.

7            When asked about the I-216 manifest which pertained to the two aliens SAINT had left

8    with, SMITH said that he didn't know if one had been submitted or what the actual I-216 did in

9    fact reflect regarding those two aliens, and that it would have been Sgt. SAINT's responsibility to

10    submit that paperwork.

11            Agent Kahl asked SMITH for consent to access and search the memory of his cell phone,

12    and SMITH granted him consent.

13    **C.    STATEMENT OF MATERIAL WITNESS WILLIAM ROMERO-ESTRADA**

14            At 4:09 p.m. on 06/02/08 material witness William Edgardo Romero-Estrada provided

15    Agent Kahl with a videotaped sworn statement in the Spanish language, which is summarized as

16    follows:

17            Romero stated that he was born in Santa Ana, El Salvador on 10/28/70.  Romero stated that

18    he does not have nor has he ever had any immigration documents allowing him to be in or remain

19    legally in the United States.  Romero stated that he was to be smuggled to Los Angeles, California,

20    and that he was to have been charged a $3,000.00 (USD) smuggling fee.  Romero stated that he

21    made the arrangements to be smuggled from Tijuana, B.C., Mexico.  Romero stated that he was

22    crossed through "El Hongo," near Tecate, B.C., Mexico last Thursday.  He stated that he was then

23    caught on Friday about 3:00 a.m.

24            After being taken to and processed at the Border Patrol Station Romero stated that he was

25    asked by Border Patrol agents if he would do something honorable.  He was asked and agreed to

26    accompany an undercover Agent on a bus of aliens being returned to Tijuana via the Port-of-Entry

27

28                                                16

1    (in San Ysidro). The Officer was pretending to be an undocumented alien. Upon his arrival at the

2    POE, Romero was asked to tell the Mexican Officers that he was from Santa Ana, Chiapas so that

3    the Mexican Officers would not accept them and they would be kicked back to the (transportation)

4    Officers when it was discovered that they were not Mexican. They were put aside by the Mexican

5    Officers until all subjects were interviewed and admitted into Mexico. Romero said that he was

6    then handcuffed to the Agent by the Officers in gray uniforms and returned to the bus.

7        Romero stated that he was then asked by the one of the officers from the bus (described as

8    fair skinned, fat 1.8M tall with dark glasses) if he had any money. Romero said he put his hands

9    in his pockets and the Officer immediately told him to "be discreet." Romero stated that he was

10   asked, "Do you have someone to pay for you?" He stated that both he and the Agent said that they

11   had someone in Los Angeles who would pay for them. Romero didn't say anything else as they

12   were driven back to the Chula Vista station. Romero stated that a black Officer, referring to

13   SMITH, parked the bus. Another black Officer dressed in gray arrived. Romero stated that he was

14   shorter than the driver. He said they spoke in English and he did not understand them. Romero

15   stated that the shorter Officer parked a vehicle, (with large letters on it) next to the bus. He stated

16   that it was a "small SUV". Romero stated that they pulled the vehicle close to the bus as if to move

17   the two of them into the SUV without being seen. Romero stated they were then driven to an

18   office, the shorter black guy got out and the "fat" white guy drove them out of the gate of the

19   station.

20       Romero stated that they went in the SUV for several blocks. They driver spoke to them

21   again and asked, "How much will your family in L.A. pay for you". Romero said $3,000.00, and

22   he said the Agent said $1,000.00. He said that the driver told them, "I am the law here, don't

23   worry, nothing will happen to you, do everything I say." He asked the officer if he could un-cuff

24   them and the officer gave them a handcuff key. Romero said that he removed his handcuffs and

25   the Agent removed his. The Officer took the handcuffs and threw them on the seat beside him.

26

27

28                                        17

1    The Officer told him that he was going to leave them in a park, not to separate or leave that spot,

2    and not to flee because he would find them, and things would go badly if they did.

3    　　A short time later a civilian double-cab pickup truck, dark brown or red, came by and made

4    a u-turn.  The driver of the pickup motioned to them three times to wait.  He was driving slowly.

5    He went out of their view and returned after 4-5 minutes.  He stopped and gestured with his hand

6    for them to come.  Romero stated that the Agent went to get into the rear, driver side of the pick-up

7    and he entered the passenger side rear door.  Romero stated the Agent then drew and pointed his

8    weapon at the driver, who was picking them up still dressed in his gray uniform.  Romero says that

9    he helped the Agent to secure the driver. Romero said that they were surrounded by about seven

10   Agents within two seconds.

11   　　Romero says that the driver was placed into a marked, caged sedan.  After returning to the

12   station Romero says that the Agents arrested the other officer that had moved the vehicle to the bus

13   for them to be loaded into.  Romero was shown two  six photograph lineup folders:  In folder "A"

14   he identified photo #2 as the Officer that pulled the Jeep up to the bus so that they could be loaded

15   into it without being seen.  Photograph #2 in photo lineup  "A" depicts defendant SMITH.

16   In folder "B" he identified photo #5 as the Officer that brought them to the park in the Jeep and

17   later tried to pick them up in his pick-up truck.  Photograph #5 in photo lineup labeled "B" depicts

18   defendant SAINT.

**III**

**MEMORANDUM OF POINTS AND AUTHORITIES**

**A.    DISCOVERY REQUESTS AND MOTION TO PRESERVE EVIDENCE**

　　**1.    The Government Has or Will Disclose Information Subject To Disclosure Under Rule 16(a)(1)(A) and (B) Of The Federal Rules Of Criminal Procedure**

　　The government has disclosed, or will disclose well in advance of trial, any statements

subject to discovery under Fed. R. Crim. P. 16(a)(1)(A) (substance of Defendant's oral statements

*in response to government interrogation*) and 16(a)(1)(B) (Defendant's relevant written or

1    recorded statements, written records containing substance of Defendant's oral statements *in*

2    *response to government interrogation*, and Defendant's grand jury testimony).

3                a.    The Government Will Comply With Rule 16(a)(1)(D)

4        To the extent he has a criminal record, Defendant has already been provided with his or her

5    own "rap" sheet and the government will produce any additional information it uncovers regarding

6    Defendant's criminal record.  Any subsequent or prior similar acts of Defendant that the

7    government intends to introduce under Rule 404(b) of the Federal Rules of Evidence will be

8    provided, along with any accompanying reports, at a reasonable time in advance of trial.

9                b.    The Government Will Comply With Rule 16(a)(1)(E)

10        The government will permit Defendant to inspect and copy or photograph all books, papers,

11    documents, data, photographs, tangible objects, buildings or places, or portions thereof, that are

12    material to the preparation of Defendant's defense or are intended for use by the government as

13    evidence-in-chief at trial or were obtained from or belong to Defendant.

14        Reasonable efforts will be made to preserve relevant physical evidence which is in the

15    custody and control of the investigating agency and the prosecution, with the following exceptions:

16    drug evidence, with the exception of a representative sample, is routinely destroyed after 60 days,

17    and vehicles are routinely and periodically sold at auction.  Records of radio transmissions, if they

18    existed, are frequently kept for only a short period of time and may no longer be available.

19    Counsel should contact the Assistant United States Attorney assigned to the case two weeks before

20    the scheduled trial date and the Assistant will make arrangements with the case agent for counsel

21    to view all evidence within the government's possession.

22                c.    The Government Will Comply With Rule 16(a)(1)(F)

23        The government will permit Defendant to inspect and copy or photograph any results or

24    reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof,

25    that are within the possession of the government, and by the exercise of due diligence may become

26    known to the attorney for the government and are material to the preparation of the defense or are

27

28                                    19

1    intended for use by the government as evidence-in-chief at the trial. Counsel for Defendant should

2    contact the Assistant United States Attorney assigned to the case and the Assistant will make

3    arrangements with the case agent for counsel to view all evidence within the government's

4    possession.

5          d.    The Government Will Comply With Its Obligations Under Brady v.
6                Maryland

7          The government is well aware of and will fully perform its duty under Brady v. Maryland,

8    373 U.S. 83 (1963), and United States v. Agurs, 427 U.S. 97 (1976), to disclose exculpatory

9    evidence within its possession that is material to the issue of guilt or punishment. Defendant,

10   however, is not entitled to all evidence known or believed to exist that is, or may be, favorable to

11   the accused, or that pertains to the credibility of the government's case. As stated in United States

12   v. Gardner, 611 F.2d 770 (9th Cir. 1980), it must be noted that:

13         [T]he prosecution does not have a constitutional duty to disclose every bit of
           information that might affect the jury's decision; it need only disclose information
14         favorable to the defense that meets the appropriate standard of materiality.

15   611 F.2d at 774-775 (citations omitted). See also United States v. Sukumolachan, 610 F.2d 685,

16   687 (9th Cir. 1980) (the government is not required to create exculpatory material that does not

17   exist); United States v. Flores, 540 F.2d 432, 438 (9th Cir. 1976) (Brady does not create any

18   pretrial privileges not contained in the Federal Rules of Criminal Procedure).

19         e.    Discovery Regarding Government Witnesses

20               (1)    Agreements.  The government has disclosed or will disclose the

21   terms of any agreements by Government agents, employees, or attorneys with witnesses that testify

22   at trial. Such information will be provided at or before the time of the filing of the Government's

23

24

25

26

27

28                                          20

1  trial memorandum.[1]  The government will comply with its obligations to disclose impeachment

2  evidence under Giglio v. United States, 405 U.S. 150 (1972).

3  (2)    Bias or Prejudice.  The government has provided or will provide

4  information related to the bias, prejudice or other motivation to lie of government trial witnesses

5  as required in Napue v. Illinois, 360 U.S. 264 (1959).

6  (3)    Criminal Convictions.  The government has produced or will

7  produce any criminal convictions of government witnesses plus any *material* criminal acts which

8  did not result in conviction.  The government is not aware that any prospective witness is under

9  criminal investigation.

10  (4)    Ability to Perceive.  The government has produced or will produce

11  any evidence that the ability of a government trial witness to perceive, communicate or tell the

12  truth is impaired or that such witnesses have ever used narcotics or other controlled substances,

13  or are alcoholics.

14  (5)    Witness List.  The government will endeavor to provide Defendant

15  with a list of all witnesses which it intends to call in its case-in-chief at the time the government's

16  trial memorandum is filed, although delivery of such a list is not required.  See United States v.

17  Dischner, 960 F.2d 870 (9th Cir. 1992); United States v. Culter, 806 F.2d 933, 936 (9th Cir.

18  1986); United States v. Mills, 810 F.2d 907, 910 (9th Cir. 1987).  Defendant, however, is not

19  entitled to the production of addresses or phone numbers of possible government witnesses.  See

20  United States v. Thompson, 493 F.2d 305, 309 (9th Cir. 1977), cert. denied, 419 U.S. 834 (1974).

21  Defendant has already received access to the names of potential witnesses in this case in the

22  investigative reports previously provided to him or her.

23

24  ────────────────

25  [1]    As with all other offers by the government to produce discovery earlier than it is required
to do, the offer is made without prejudice.  If, as trial approaches, the government is not prepared

26  to make early discovery production, or if there is a strategic reason not to do so as to certain
discovery, the government reserves the right to withhold the requested material until the time it is

27  required to be produced pursuant to discovery laws and rules.

28  21

1       (6)     <u>Witnesses Not to Be Called.</u>  The government is not required to

2    disclose all evidence it has or to make an accounting to Defendant of the investigative work it has

3    performed.  <u>Moore v. Illinois</u>, 408 U.S. 786, 795 (1972); <u>see</u>  <u>United States v. Gardner</u>, 611 F.2d

4    770, 774-775 (9th Cir. 1980).  Accordingly, the government objects to any request by Defendant

5    for discovery concerning any individuals whom the government does not intend to call as

6    witnesses.

7       (7)     <u>Favorable Statements.</u>  The government has disclosed or will

8    disclose the names of witnesses, if any, who have made favorable statements concerning Defendant

9    which meet the requirements of <u>Brady</u>.

10      (8)     <u>Review of Personnel Files.</u>  The government has requested or will

11    request a review of the personnel files of all federal law enforcement individuals who will be called

12    as witnesses in this case for <u>Brady</u> material.  The government will request that counsel for the

13    appropriate federal law enforcement agency conduct such review.  <u>United States v. Herring</u>, 83

14    F.3d 1120 (9th Cir. 1996); <u>see</u>, <u>also</u>, <u>United States v. Jennings</u>, 960 F.2d 1488, 1492 (9th Cir.

15    1992); <u>United States v. Dominguez-Villa</u>, 954 F.2d 562 (9th Cir. 1992).

16    Pursuant to <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991) and <u>United States v.</u>

17    <u>Cadet</u>, 727 F.2d 1452 (9th Cir. 1984), the United States agrees to "disclose information favorable

18    to the defense that meets the appropriate standard of materiality . . ."  <u>United States v. Cadet</u>, 727

19    F.2d at 1467, 1468.  Further, if counsel for the United States is uncertain about the materiality of

20    the information within its possession in such personnel files, the information will be submitted to

21    the Court for <u>in</u> <u>camera</u> inspection and review.

22      (9)     <u>Government Witness Statements.</u> Production of witness statements

23    is governed by the Jencks Act, 18 U.S.C. § 3500, and need occur only after the witness testifies

24    on direct examination. <u>United States v. Taylor</u>, 802 F.2d 1108, 1118 (9th Cir. 1986); <u>United States</u>

25    <u>v. Mills</u>, 641 F.2d 785, 790 (9th Cir. 1981)).  Indeed, even material believed to be exculpatory and

26    therefore subject to disclosure under the <u>Brady</u> doctrine, if contained in a witness statement subject

27

28                             22

1    to the Jencks Act, need not be revealed until such time as the witness statement is disclosed under

2    the Act.  See United States v. Bernard, 623 F.2d 551, 556-57 (9th Cir. 1979).

3         The government reserves the right to withhold the statements of any particular witnesses

4    it deems necessary until after the witness testifies.  Otherwise, the government will disclose the

5    statements of witnesses at the time of the filing of the government's trial memorandum, provided

6    that defense counsel has complied with Defendant's obligations under Federal Rules of Criminal

7    Procedure 12.1, 12.2, and 16 and 26.2 and provided that defense counsel turn over all "reverse

8    Jencks" statements at that time.

9
         f.    The Government Objects To The Full Production Of Agents' Handwritten
10             Notes At This Time

11        Although the government has no objection to the preservation of agents' handwritten notes,

12   it objects to requests for full production for immediate examination and inspection.  If certain

13   rough notes become relevant during any evidentiary proceeding, those notes will be made

14   available.

15        Prior production of these notes is not necessary because they are not "statements" within

16   the meaning of the Jencks Act unless they comprise both a substantially verbatim narrative of a

17   witness' assertions *and* they have been approved or adopted by the witness.  United States v.

18   Spencer, 618 F.2d 605, 606-607 (9th Cir. 1980); see also United States v. Griffin,  659 F.2d 932,

19   936-938 (9th Cir. 1981).

20             g.    All Investigatory Notes and Arrest Reports

21        The government objects to any request for production of all arrest reports, investigator's

22   notes, memos from arresting officers, and prosecution reports pertaining to Defendant.  Such

23   reports, except to the extent that they include Brady material or the statements of Defendant, are

24   protected from discovery by Rule 16(a)(2) as "reports . . . made by . . . Government agents in

25   connection with the investigation or prosecution of the case."

26

27

28                                          23

1    Although agents' reports may have already been produced to the defense, the government

2    is not required to produce such reports, except to the extent they contain <u>Brady</u> or other such

3    material. Furthermore, the government is not required to disclose all evidence it has or to render

4    an accounting to Defendant of the investigative work it has performed. <u>Moore v. Illinois</u>, 408 U.S.

5    786, 795 (1972); <u>see</u> <u>United States v. Gardner</u>, 611 F.2d 770, 774-775 (9th Cir. 1980).

6            h.      <u>Expert Witnesses</u>.

7    Pursuant to Fed. R. Crim. P. 16(a)(1)(G), at or about the time of filing its trial

8    memorandum, the government will provide the defense with notice of any expert witnesses the

9    testimony of whom the government intends to use under Rules 702, 703, or 705 of the Fed. R. of

10   Evidence in its case-in-chief. Such notice will describe the witnesses' opinions, the bases and the

11   reasons therefor, and the witnesses' qualifications. Reciprocally, the government requests that the

12   defense provide notice of its expert witnesses pursuant to Fed. R. Crim. P. 16(b)(1)(C).

13           i.      <u>Information Which May Result in Lower Sentence</u>.

14   Defendant has claimed or may claim that the government must disclose information about

15   any cooperation or any attempted cooperation with the government as well as any other

16   information affecting Defendant's sentencing guidelines because such information is discoverable

17   under <u>Brady v. Maryland</u>. The government respectfully contends that it has no such disclosure

18   obligations under <u>Brady</u>.

19   The government is not obliged under <u>Brady</u> to furnish a defendant with information which

20   he already knows. <u>United States v. Taylor</u>, 802 F.2d 1108, 1118 n.5 (9th Cir. 1986), <u>cert. denied</u>,

21   479 U.S. 1094 (1987); <u>United States v. Prior</u>, 546 F.2d 1254, 1259 (5th Cir. 1977). <u>Brady</u> is a rule

22   of disclosure. There can be no violation of <u>Brady</u> if the evidence is already known to Defendant.

23   Assuming that Defendant did not already possess the information about factors which

24   might affect their respective guideline range, the government would not be required to provide

25   information bearing on Defendant's mitigation of punishment until after Defendant's conviction

26   or plea of guilty and prior to his sentencing date. "No [<u>Brady</u>] violation occurs if the evidence is

27

28                                               24

disclosed to the defendant at a time when the disclosure remains of value." United States v. Juvenile Male, 864 F.2d 641 (9th Cir. 1988).

**B.    NO OPPOSITION TO LEAVE TO FILE FURTHER MOTIONS**

The United States does not object to the granting of leave to allow Defendant to file further motions, as long as the order applies equally to both parties and additional motions are based on newly discovered evidence or discovery provided by the United States subsequent to the instant motion at issue.

**IV**

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that Defendant's motions, except where not opposed, be denied.


DATED: July 24, 2008.

                                        Respectfully submitted,

                                        KAREN P. HEWITT
                                        United States Attorney


                                        s/ W. Mark Conover
                                        W. MARK CONOVER
                                        Assistant United States Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 08CR1916-JM |
| Plaintiff | CERTIFICATE OF SERVICE |
| v. | |
| CHRISTOPHER SAINT LUCERO, | |
| Defendant(s). | |

IT IS HEREBY CERTIFIED THAT:

I, W. MARK CONOVER, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of UNITED STATES' RESPONSE TO DEFENDANT'S MOTIONS on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

1. Debra A. Dilorio.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 24, 2008.

s/ W. Mark Conover
W. MARK CONOVER